UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:23-cr-00120-JAW-1 |
| | ) | |
| RYAN PARTRIDGE | ) | |
| | ) | |

**ORDER ON MOTION TO SUPPRESS**

A criminal defendant moves to suppress all evidence obtained as a result of the traffic stop that culminated in his arrest, contending law enforcement initiated the stop without reasonable suspicion, illegally prolonged the stop, and searched the stopped sedan without probable cause. The Court rejects each of the defendant's arguments, concluding police lawfully stopped the sedan because of its cracked windshield and suspended registration, expanded the scope of the stop after acquiring reasonable suspicion of drug activity, and searched the sedan after acquiring probable cause that drug-related evidence would be found within. The Court also rejects the defendant's argument that there is insufficient evidence supporting the government's version of events, concluding that, although officers failed to record audio of the stop and take pictures of certain evidence supporting probable cause, their testimony was nonetheless credible. Accordingly, the Court denies the defendant's motion.

## I. PROCEDURAL BACKGROUND

On September 27, 2023, the United States filed a criminal complaint against Ryan Partridge, charging him with one count of distributing and possessing with the intent to distribute controlled substances, a violation of 21 U.S.C. § 841(a)(1), and one

count of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). *Criminal Compl.* (ECF No. 1).  In support of the complaint, the Government attached the affidavit of Jonathan Duquette, an FBI Task Force Officer.  *Id.*, Attach. 1, *Aff. in Supp. of a Criminal Compl.* (*Duquette Aff.*).

On November 1, 2023, a federal grand jury returned a three-count indictment against Mr. Partridge, charging him with: 1) possession with intent to distribute 40 grams or more of fentanyl, a violation of 21 U.S.C. § 841(a)(1); 2) possession of a firearm by a felon, a violation of 18 U.S.C. § 922(g)(1); and 3) possession of a firearm during and in relation to a drug trafficking crime, a violation of 18 U.S.C. § 924(c)(1)(A).  *Indictment* (ECF No. 1).[1]  The indictment also contains an allegation that, if convicted, Mr. Partridge is subject to the enhanced mandatory minimum provisions of 21 U.S.C. §§ 841(b)(1)(B) and 851.[2]  *Id.* at 2-3.  Finally, the indictment contains two forfeiture allegations.  *Id.* at 3-4.

---

[1]     The docket starts on September 27, 2023, with the filing of the criminal complaint as ECF Number 1.  *See Criminal Compl.* (ECF No. 1).  The docket continues sequentially through ECF Number 19, filed on October 24, 2023, reflecting proceedings related to the criminal complaint.  *See Conditional Order of Detention After Hr'g* (ECF No. 19).  When the grand jury issued the indictment on November 1, 2023, the indictment was also filed under ECF Number 1.  *Indictment* (ECF No. 1).  The indictment synopsis, like the synopsis for the criminal complaint, was filed under ECF Number 2.  *Indictment Synopsis* (ECF No. 2).  After the indictment synopsis, the docket numbering reverts to continue sequentially from the proceedings related to the criminal complaint, starting from ECF Number 20.  *See Notice of Hr'g* (ECF No. 20).

[2]     The indictment alleges that Mr. Partridge possessed with the intent to distribute 40 grams or more of a mixture or substance containing fentanyl.  *Indictment* at 1 (ECF No. 1).  This allegation places Mr. Partridge within 21 U.S.C. § 841(b)(1)(B).  *See* 21 U.S.C. § 841(b)(1)(B)(vi).  In addition, the synopsis cites 21 U.S.C. § 851, which addresses proceedings to establish a prior conviction.  Under § 841(b)(1)(B), if a defendant has a prior conviction for a serious drug offense or a serious violent felony, the defendant is subject to an enhanced penalty of not less than ten years nor more than life imprisonment, a fine not to exceed $8,000,000, supervised release of not less than four years nor more than life, and a special assessment of $100.  In Mr. Partridge's case, the synopsis contains the enhanced penalties based on a prior qualifying conviction.  *Indictment Synopsis* (ECF No. 2).  The Government has not, however, made a § 851 filing.

On December 20, 2023, Mr. Partridge filed a motion to suppress all evidence arising out of the July 10, 2023 traffic stop that culminated in his arrest. *Mr. Partridge's Mot. to Suppress* (ECF No. 27) (*Def.'s Mot.*). On January 26, 2024, the Government responded. *Gov't's Resp. in Opp'n to Def.'s Mot. to Suppress* (ECF No. 34) (*Gov't's Opp'n*). On February 23, 2024, Mr. Partridge replied. *Mr. Partridge's Reply Mem. in Supp. of Mot. to Suppress* (ECF No. 37) (*Def.'s Reply*). On April 17, 2024, the Court held an evidentiary hearing on Mr. Partridge's motion, at the end of which the parties argued orally and elected not to submit additional filings. *Min. Entry* (ECF No. 42).

## II.   FACTUAL BACKGROUND

### A.   The Government's Evidence in Opposition to Ryan Partridge's Motion to Suppress

In adjudicating Mr. Partridge's motion, the Court principally relies on police reports authored by Augusta Police Department (APD) Officer Simon Yorks,[3] APD Officer Joshua Gallagher, and APD Detective Benjamin Murtiff, as well as the testimony of Officer Yorks and Officer Gallagher at the evidentiary hearing. The Court was able to corroborate certain details by viewing the dashcam video from Officer Yorks' police cruiser, which was admitted into evidence. *See Mot. to Suppress Hr'g*, Gov't's Ex. 5, *Full Cruiser Camera Video* (*Yorks Cruiser Video*). However, the Court could not corroborate every detail because Officer Yorks' body-worn

---

[3]      Officer Yorks testified at the April 17, 2024 evidentiary hearing that he has since taken a position as a Deputy Sheriff for the Kennebec County Sheriff's Office. Nevertheless, to avoid confusion about what law enforcement agency was involved in the July 10, 2023 traffic stop, the Court uses "Officer Yorks" throughout this order.

microphone failed to record audio of the July 10, 2023 traffic stop, and Officer Gallagher did not manually activate his microphone. At the April 17, 2024 evidentiary hearing, counsel for the Government and Mr. Partridge explored this lack of audio, as well as the lack of video evidence from Officer Gallagher's police cruiser. The relevant testimony is summarized below.[4]

Officer Yorks was wearing a microphone during the July 10, 2023 traffic stop, and his police cruiser was equipped with a dashcam. Both the microphone and the dashcam were programmed to record whenever Officer Yorks activated his cruiser's emergency lights. Although Officer Yorks' emergency lights were activated during July 10, 2023 traffic stop, and his dashcam recorded video of the stop, his microphone did not record audio. Officer Yorks testified that he thought his microphone was recording audio during the stop, that he did not know why his microphone failed to record, and that he only realized his microphone had malfunctioned when he reviewed his dashcam video after the stop. Officer Yorks testified that he has "no idea" why the audio did not work on July 10, 2023.

When Officer Gallagher arrived on scene, he did not turn on his emergency lights or manually activate either his cruiser's dashcam or his body-worn microphone. Officer Gallagher testified that because he initially believed he would only be performing scene security, he did not think to manually activate his dashcam. Since

---

[4]     Because the parties elected not to submit additional written memoranda following the evidentiary hearing, the Court did not order a transcript of the hearing, opting instead to resolve the motion as expeditiously as possible. Accordingly, the Court does not include citations for facts derived from testimony taken at the evidentiary hearing. The Court supplies record citations for all other facts.

Officer Yorks had activated his emergency lights, Officer Gallagher assumed Officer Yorks' dashcam was recording the encounter, and because Officer Gallagher's cruiser was parked behind Officer Yorks' cruiser, Officer Gallagher testified that it is unlikely his dashcam would have captured the scene had it been activated.

After the stop, Officer Gallagher reviewed the dashcam footage from Officer Yorks' police cruiser and determined that Officer Yorks' body-worn microphone had failed to record audio. According to Officer Gallagher, the microphones issued to APD officers periodically malfunction. Officer Gallagher testified that APD officers are instructed to activate their microphones during all felony stops. He conceded that the July 10, 2023 traffic stop eventually developed into a felony stop but represented that he forgot to activate his microphone. Accordingly, the only recording of the July 10, 2023 traffic stop comes from Officer Yorks' dashcam, for which there is no audio.

### B.    The July 10, 2023 Traffic Stop

On July 10, 2023, Simon Yorks, at the time a patrol officer with the APD, was on patrol in Augusta, Maine.[5] *Mot. to Suppress Hr'g*, Gov't's Ex. 1, *Augusta PD Incident Report*, at 6-8, *Narrative for Patrol Simon A. Yorks* at 1 (*Yorks Narrative*).[6] At approximately 1:07 p.m., Officer Yorks was traveling on Commercial Street behind a red Toyota sedan with Maine license plate 5083UG. *Id.*; *Yorks Cruiser Video* at 00:00-00:25.

---

[5]    Officer Yorks testified that he worked for the APD for eight years and that he had joined the Kennebec County Sheriff's Office four months before the evidentiary hearing. Officer Yorks' first day at the Kennebec County Sheriff's Office was December 18, 2023.

[6]    The Government placed all police reports into evidence as an undifferentiated Government's Exhibit 1. *See Ct. Ex. List* (ECF No. 43). The officers' reports, which are separate reports, are within the exhibit. To assist the reader, the Court has cited both the general page from the exhibit as a whole and the specific page from each officer's report.

Officer Yorks noticed the sedan's front windshield was "badly cracked"[7] and asked dispatch to check the car's registration.[8]  *Yorks Narrative* at 1.  Dispatch informed Officer Yorks that the sedan was registered to Jennifer Watson and its registration was suspended for toll violations.  *Id.*  Correspondence from the Maine Bureau of Motor Vehicles to Ms. Watson confirms that the registration for Ms. Watson's 2021 Toyota Corolla with Maine license plate 5083UG was suspended from July 7, 2023 until July 26, 2023 for failure "to pay a toll, applicable fines and/or penalties."  *Mot. to Suppress Hr'g*, Gov't's Ex. 2, *Letters from Nikki Bachelder, Dir. of Vehicle Servs., Me. Bureau of Motor Vehicles to Jennifer Watson (June 22, 2023 & July 27, 2023)* (*BMV Letters*).  Officer Yorks testified that a suspended registration is a Class E misdemeanor under Maine law and is an arrestable offense.

After learning about the suspended registration, Officer Yorks decided to stop the sedan, *Yorks Narrative* at 1, and initiated a traffic stop on Water Street.  *Id.*; *Yorks Cruiser Video* at 00:48-01:15.  At no point during the traffic stop did Officer Yorks or any other officer photograph the sedan's cracked windshield.  There is, however, evidentiary confirmation that Ms. Watson's Toyota Corolla's registration was suspended on July 10, 2023.  *See BMV Letters.*

---

[7]      Mr. Partridge questions the extent of the crack in the sedan's windshield.  As the condition of the windshield is not apparent from Officer Yorks' dashcam video, the only evidence of the crack in the windshield comes from Officer Yorks' police report and testimony at the April 17, 2024 evidentiary hearing.  To hew as closely as possible to the record, the Court uses the phrasing from Officer Yorks' police report, which he repeated at the evidentiary hearing.

[8]      At the evidentiary hearing, Officer Gallagher twice testified that he did not recall observing that the sedan's windshield was cracked.  Both times, however, Officer Gallagher clarified that he was not focused on whether the windshield was cracked.

There were three occupants in the sedan: a female driver; a male passenger in the front seat; and a female passenger in the back seat. As Officer Yorks approached the sedan on the passenger side, he observed the rear passenger reach under herself while looking around but she stopped upon seeing him. *Yorks Narrative* at 1. Officer Yorks later recognized the rear passenger as Heather Jones, and he was familiar with Ms. Jones from prior drug investigations and police contacts. *Id.*; *Mot. to Suppress Hr'g*, Gov't's Ex. 1, *Augusta PD Incident Report*, at 10, *Suppl. Narrative for Patrol Joshua A. Gallagher* at 1 (*Gallagher Narrative*).

Upon reaching the sedan, Officer Yorks spoke with the driver through the open front passenger window and explained the reason for the stop. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 01:30-01:50. The driver provided Officer Yorks with her driver's license, which identified her as Jennifer Watson. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 02:02-02:11. The front passenger informed Officer Yorks that he did not have identification with him but his name was "Aaron Watson." *Yorks Narrative* at 1. This individual was later identified as Ryan Partridge. *Id.* at 2.

While Officer Yorks was speaking with Ms. Watson, he observed a small tan rubber container sitting on the sedan's center console. *Id.* at 1; *Gallagher Narrative* at 1. Officer Yorks was familiar with such containers from past drug investigations, and he knew they were commonly used to store illegal drugs. *Yorks Narrative* at 1. Further, while Officer Yorks was waiting for Ms. Watson to produce her insurance information, he observed a small metal rod, which he recognized as a "push rod," situated near Mr. Partridge's legs. *Id.* Officer Yorks knew such push rods were

commonly used to clean pipes for smoking illegal narcotics. *Id.* Mr. Partridge told Officer Yorks that he had used the rod to assist another individual with opening a gasoline container. *Id.*

Neither Officer Yorks nor any of the other officers on scene photographed the push rod, and Officer Yorks testified that the push rod was not seized as evidence because it was a "minor piece of drug paraphernalia" that would not form the basis of a criminal charge against any of the sedan's occupants. Officer Yorks conceded that it was typical for APD officers to photograph items supporting a probable cause determination; however, he could not remember whether department policy required the taking of such photographs. Officer Gallagher testified that he "knew" Officer Yorks had observed a push rod in the vehicle but did not recall seeing the push rod himself. Like Officer Yorks, Officer Gallagher could not recall APD's photography policy regarding items supporting probable cause determinations.

As Officer Yorks was observing the rubber container and push rod, Ms. Jones resumed reaching around in the back seat. *Yorks Narrative* at 1. Since Ms. Jones' behavior unnerved Officer Yorks, he asked Ms. Jones to exit the vehicle. *Id.* Ms. Jones complied and stood at the rear of the sedan. *Id.*; *Yorks Cruiser Video* at 03:45-04:14. Since Ms. Jones was wearing only a bathrobe, Ms. Watson briefly exited the sedan to provide her with a blanket. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 05:25-05:52. Officer Gallagher, who arrived on scene after Officer Yorks made the initial stop, stood near the rear passenger door of the sedan monitoring Ms. Jones. *Yorks Narrative* at 1; *Gallagher Narrative* at 1.

8

After Ms. Jones exited the sedan, Officer Yorks returned to talking with Ms. Watson. *Yorks Cruiser Video* at 06:10-06:20. Officer Yorks asked Ms. Watson about the contents of the tan rubber container, and Ms. Watson replied that there were "dabs" inside the container. *Yorks Narrative* at 1. Dabs are apparently a form of marijuana concentrate, which Officer Yorks described as a waxy material that people typically smoke with a pipe apparatus. Officer Yorks asked Ms. Watson to show him the contents of the container. *Id.* Ms. Watson opened the container and held it out toward Officer Yorks. *Id.* Inside the container, Officer Yorks observed a tan powder residue consistent with heroin or fentanyl. *Id.* Officer Yorks informed Ms. Watson of his observations. *Id.* In response, Ms. Watson insisted she was a marijuana professional and the container held some form of THC at one time. *Id.* Because Officer Yorks knew, based on his training and experience, that the residue inside the container was consistent with heroin or fentanyl, he did not believe Ms. Watson's statements.

At some point, Officer Yorks took the container from Ms. Watson and placed it on the roof of the sedan. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 06:30-07:14, 07:50-08:01; *Mot. to Suppress Hr'g*, Gov't's Ex. 3A, *Screenshot from Cruiser Camera Video* (*Screenshot*). The container is visible in Officer Yorks' dashcam video and in a screenshot from Officer Yorks' dashcam. *Yorks Cruiser Video* at 06:30-07:14, 07:50-08:01; *Screenshot*. Further, Officer Gallagher testified that he was positioned in a way that allowed him to see the container and he recognized the container as being the type commonly used to hold illegal narcotics. Neither Officer Yorks nor any other

9

officer on scene photographed the container, which Officer Yorks described as an "oversight."   Officer Yorks speculated that the officers may have forgotten to photograph the container because they collected a large amount of evidence from the scene.   Officer Gallagher similarly testified that he did not know why the officers failed to photograph the container and push rod.   Officer Yorks represented that he did not seize the container because he did not think the residue inside was sufficient to form the basis of a criminal charge.

Having observed the push rod and the rubber container that appeared to hold residue from illegal narcotics, Officer Yorks advised Ms. Watson that he intended to search the sedan. *Yorks Narrative* at 1; *Gallagher Narrative* at 1.   Ms. Watson objected. *Yorks Narrative* at 1.   Officer Yorks informed Ms. Watson that she could not refuse the search because he had developed probable cause that drug crimes were occurring in the sedan. *Id.*   Ms. Watson and Mr. Partridge then exited the vehicle. *Id.*; *Yorks Cruiser Video* at 09:35-10:24.   After being patted down for weapons, they were seated on the curb near the rear of the vehicle. *Yorks Narrative* at 1; *Gallagher Narrative* at 1; *Yorks Cruiser Video* at 09:45-11:49.   Around the same time, Ms. Jones was also seated on the curb. *Gallagher Narrative* at 1; *Yorks Cruiser Video* at 10:33-10:38.   Officer Gallagher monitored the sedan's occupants while Officer Yorks began his search. *Gallagher Narrative* at 1.

Officer Yorks initially searched the area of the sedan's front passenger seat, focusing on a backpack that had been between Mr. Partridge's legs. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 11:40-12:02.   When Officer Yorks opened the backpack,

he observed a hypodermic needle and many plastic baggies. *Yorks Narrative* at 1. Officer Yorks further located a white fanny pack inside the backpack. *Id.* Upon opening the main zipper of the fanny pack, Officer Yorks found a gallon Ziploc baggie, which contained two additional baggies, one holding a large chunk of a tan powder substance. *Id.* This tan powder substance was consistent with fentanyl or heroin, and it later tested positive for fentanyl. *Id.* at 1-2. After locating the tan powder substance, Officer Yorks placed Mr. Partridge in handcuffs. *Id.* at 1; *Gallagher Narrative* at 1.

Officer Yorks then returned to searching the fanny pack, finding two more tied-off baggies containing the same tan powder substance consistent with heroin or fentanyl. *Yorks Narrative* at 2. After opening the back zipper of the fanny pack, Officer Yorks observed a handgun. *Id.* Officer Yorks inspected the handgun and determined it was a Taurus 9mm, which held a loaded magazine containing seven rounds of ammunition. *Id.* After finding the handgun, Officer Yorks restrained Ms. Watson and Ms. Jones in handcuffs for officer safety. *Id.*; *Gallagher Narrative* at 1. Later, Officer Yorks determined Mr. Partridge had been previously convicted of Aggravated Trafficking of Scheduled Drugs, a felony offense. *Yorks Narraitve* at 2. As a result, Mr. Partridge could not legally possess a firearm. *Id.*

After Ms. Watson and Ms. Jones were handcuffed, Detectives Murtiff and Walker of the Augusta Police Department arrived on scene. *Id.*; *Mot. to Suppress Hr'g*, Gov't's Ex. 1, *Augusta PD Incident Report*, at 9, *Suppl. Narrative for Detective Benjamin J. Murtiff* at 1 (*Murtiff Narrative*). Detective Murtiff recognized Mr.

Partridge from previous interactions and informed Officer Yorks that Mr. Partridge's name was Ryan Partridge, not Aaron Watson. *Yorks Narrative* at 2; *Murtiff Narrative* at 1. After Mr. Partridge was identified, dispatch confirmed that there was an active warrant for his arrest from the state of Maine for a probation revocation. *Yorks Narrative* at 2; *Murtiff Narrative* at 1. At this point, Mr. Partridge was placed under arrest. *Yorks Narrative* at 2.

Afterwards, the officers completed their search of the vehicle. *Yorks Narrative* at 2. During this time, Detective Murtiff found a debit card bearing the name "Ryan Partridge" in the backpack that had been between Mr. Partridge's legs. *Murtiff Narrative* at 1. At the conclusion of the search, Officer Yorks transported Mr. Partridge to the Kennebec County Correctional Center. *Yorks Narrative* at 2. Officer Gallagher remained on scene and issued summonses to Ms. Watson for unlawful possession of a scheduled drug and operating with a suspended registration. *Yorks Narrative* at 2; *Gallagher Narrative* at 1. Despite the vehicle's "badly cracked" windshield and suspended registration, Officer Gallagher allowed Ms. Watson to drive away in the sedan. *Gallagher Narrative* at 1.

## III.   THE PARTIES' POSITIONS

### A.   Ryan Partridge's Motion to Suppress

In his motion to suppress, Mr. Partridge argues that "there was no probable cause to stop the vehicle, no probable cause to search the vehicle, [and] no probable cause to search the backpack and any evidence seized therefrom and any fruits thereof must be suppressed." *Def.'s Mot.* at 4 (capitalization altered).

12

Regarding the initial stop, Mr. Partridge claims the "impetus for the stop was purported to be a 'severely cracked windshield,'" yet "[t]here is nothing in the record to tell us the nature of that cracked windshield." *Id.* at 5. Mr. Partridge further avers that "[t]here is no description of the location of the crack and there is no description of the size of the crack," and "[e]ach of these factors bears on whether any illegality attended the cracked windshield." *Id.* at 5-6 (footnote omitted).

Mr. Partridge then disputes the existence of reasonable suspicion to expand the scope of the traffic stop and probable cause to search the sedan. *Id.* at 6-7. He declares that "we have no photographs to support Officer Yorks's assertion as to the presence or character of a 'small tan rubber container' or a 'push rod' each of which law enforcement relies upon in asserting that it possessed probable cause to search the noted vehicle and the backpack located in the passenger compartment." *Id.* at 6. Therefore, Mr. Partridge argues, "there is nothing in the record to substantiate the presence or character of the 'small tan rubber container' or the 'push rod' upon which [the Government] relies to suggest those items provided reasonable suspicion of drug activity." *Id.* at 7.

Mr. Partridge concludes by asserting that all evidence "derived from the illegally seized evidence," including his later statements to law enforcement, "should be excluded as 'fruit of the poisonous tree.'" *Id.* at 7-8 (capitalization altered). Mr. Partridge contends that "but for the illegal search, law enforcement would not have undertaken its subsequent interview of Mr. Partridge and would not have obtained any incriminating statements from him." *Id.* at 8. Mr. Partridge then asks the Court

to "suppress[] and exclud[e] from trial all evidence obtained as a result of the illegal and unconstitutional stop and search of the vehicle and backpack referenced herein, and all 'fruits' derived therefrom to include but not be limited to any statements provided to law enforcement." *Id.* at 8-9.

### B. The Government's Opposition

In response, the Government maintains that "police action was lawful at each step of the encounter." *Gov't's Opp'n* at 6.  The Government takes issue with Mr. Partridge's focus on the sedan's cracked windshield, arguing that "it is indisputable that officers lawfully conducted the stop of the Subject Vehicle based upon its registration suspension." *Id.* at 13.  In the Government's view, "[t]he registration suspension was an independent basis (and Officer Yorks's professed reason) for stopping the Subject Vehicle." *Id.*

The Government further asserts that "once the traffic stop was lawfully underway, officers quickly developed reasonable suspicion—and then probable cause—to believe that evidence of drug trafficking would be present in the Subject Vehicle*." Id.*  In support of its contention that there was probable cause to search the sedan, the Government argues that "[b]y the time officers decided to search the vehicle they had learned (1) the driver was operating with a suspended registration, (2) there was a strangely behaving, bizarrely dressed, known drug user in the vehicle, [and] (3) there was drug paraphernalia and residue in the vehicle." *Id.* at 14.  The Government also points out that "[d]uring the pendency of the search, officers learned (4) the defendant had lied about his identity, (5) he was in fact a drug trafficking

suspect in prior investigations, and (6) he had a warrant for his arrest." *Id.* Therefore, the Government contends, even if the Court "concluded that the record was bereft of evidence of the cracked windshield, the rubber container, and the push rod, defendant's motion would still fail" because "[p]robable cause to arrest the defendant and to search his person and effects existed independent of these items." *Id.* at 14-15.

The Government next argues that the active warrant for Mr. Partridge's arrest "serves as an intervening circumstance which would have the effect of insulating the discovery of the contraband and the defendant's inculpatory statements from any unconstitutional intrusion during the traffic stop." *Id.* at 5-6.  In support, the Government analogizes this case to the United States Supreme Court's decision in *Utah v. Strieff*, 579 U.S. 232 (2016).  According to the Government, *Strieff* instructs that in order "to determine whether [a] valid preexisting arrest warrant served as a 'sufficient intervening event to break the causal chain between the unlawful stop and the discovery of' contraband," the Court must consider three factors: "(1) the 'temporal proximity' between the constitutional violation and the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the 'purpose and flagrancy of the official misconduct,' which is the most significant factor." *Gov't's Opp'n* at 9 (quoting *Strieff*, 579 U.S. at 239).

Although the Government "concedes that the temporal proximity factor would weigh in favor of suppression," it contends that the second two *Strieff* factors weigh in favor of attenuation.  *Id.* at 11.  Regarding the second factor—intervening

15

circumstances—the Government notes that "[a]s in *Strieff*, the defendant's arrest warrant was wholly unconnected to [the] reasons for the traffic stop, and provided an independent basis for the search of the defendant's backpack pursuant to his arrest." *Id.* With respect to the third factor—the purposefulness or flagrancy of any constitutional violations—the Government maintains that "it is indisputable that Officer Yorks observed concerning conduct by the backseat passenger whom he knew to be a drug user from prior investigations, and that the defendant was identified as a drug user by a fellow officer (after having provided Officer Yorks with a false name)." *Id.* Therefore, the Government continues, "[a]ssuming *arguendo* that Officer Yorks did not observe fentanyl residue in the rubber container or the existence of the push rod, he was still, at the very least, within a hair's breadth of probable cause to search—an error in judgment that hardly rises to the level of a purposeful or flagrant constitutional violation." *Id.*

Finally, the Government argues the contraband recovered from Mr. Partridge's backpack is admissible under the inevitable discovery doctrine. *Id.* at 12-13. In the Government's view, "[t]he defendant's outstanding arrest warrant provided officers with an independent basis to search the defendant's person and his effects pursuant to arrest, meaning that the contraband would have been discovered regardless of the probable cause to search that developed during the traffic stop." *Id.* at 12.

According to the Government, all three prerequisites for the inevitable discovery doctrine are met here. First, "the defendant's outstanding arrest warrant was completely independent from the stop of the Subject Vehicle." *Id.* Next, "the

arrest warrant required officers to arrest the defendant, and pursuant to his arrest, officers would have searched the defendant's person and his effects—including the backpack that defendant . . . held between his legs." *Id.* Finally, "application of the doctrine here would not reward police misconduct . . . nor would it dilute constitutional protections." *Id.* at 13. As a result, while maintaining that no Fourth Amendment violation occurred, the Government suggests that "[t]he Court need not consider the contours of the stop in order to deny suppression." *Id.* at 6.

### C.     Ryan Partridge's Reply

In his reply, Mr. Partridge first takes issue with the Government's claim that Officer Yorks stopped the sedan because its registration was suspended, noting that the Duquette Affidavit states Officer Yorks made the initial stop "after noticing that the Subject Vehicle's windshield was badly cracked." *Def.'s Reply* at 1 (emphasis omitted) (quoting *Duquette Aff.* ¶ 3). In Mr. Partridge's view, the Government "does not suggest that the Duquette Affidavit is wrong," and instead "just identifies a new basis that perhaps is easier for the government to support in the face of the defense suppression motion." *Id.* at 1-2.

Next, Mr. Partridge argues "the government has failed to avail itself of the opportunity to cure the defects in its probable cause case with respect to the 'container' and 'push rod' upon which officers relied to search the vehicle and the backpack." *Id.* at 2. Mr. Partridge points out that the container and push rod "could have been photographed at the scene thereby 'memorializing' [their] presence in the

vehicle," and he avers that "[t]he failure to do so creates factual questions that should be resolved at an evidentiary hearing." *Id.*

Turning to the Government's argument that the attenuation doctrine applies under *Strieff*, Mr. Partridge suggests that "[a]t least two" of the factors identified by the Government "cut in [his] favor and support excluding the drugs, firearm and . . . statements." *Id.* at 3. Mr. Partridge agrees with the Government that "[t]he temporal proximity test weighs against attenuation." *Id.* at 4. However, he disputes the Government's contention that the second factor—intervening circumstances— supports attenuation. *Id.* at 4-5. According to Mr. Partridge, "it goes without saying that Augusta police officers involved in this stop and search would not have learned of the warrant but for the unconstitutional stop of the vehicle." *Id.* at 5 (emphasis omitted). Therefore, Mr. Partridge maintains that *Strieff* is distinguishable because here the APD officers' knowledge of the arrest warrant "was wholly dependent upon the illegal stop" and "the searching officer was unaware of the warrant at the time of the stop and at the time of the search." *Id.* (emphasis omitted).

Mr. Partridge concludes by asking the Court to "issue an order suppressing and excluding from trial all evidence obtained as a result of the illegal and unconstitutional stop and search of the vehicle and backpack referenced herein and all 'fruits' derived therefrom to include but not be limited to any statements made by Mr. Partridge to law enforcement." *Id.* at 6-7.

## IV.   DISCUSSION

### A.   Reasonable Suspicion for the Initial Traffic Stop

Mr. Partridge first contends the Government has not shown that Officer Yorks had a legally sufficient basis to stop the sedan on July 10, 2023.  "A traffic stop, by definition, embodies a detention of the vehicle and its occupants.  It therefore constitutes a seizure within the purview of the Fourth Amendment." *United States v. Chhien*, 266 F.3d 1, 5 (1st Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  "Stopping a vehicle for a traffic violation is akin to a *Terry* stop." *United States v. Morganstern*, 512 F. Supp. 3d 31, 34-35 (D. Me. 2020).  As a result, "a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop." *United States v. Ruidíaz*, 529 F.3d 25, 28 (1st Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968); and *Chhien*, 266 F.3d at 6).  One type of criminal activity that can justify a traffic stop is "unlawful conduct involving a motor vehicle or its operation." *United States v. Jenkins*, 680 F.3d 101, 104 (1st Cir. 2012) (Souter, J.); *see also United States v. Carr*, 534 F. Supp. 3d 143, 147 (D. Me. 2021) ("[I]nitiation of a traffic stop will not violate the detained individuals' constitutional rights if the stop is supported by the officer's observation of a traffic violation (citing *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009))).

Here, the record establishes that Officer Yorks initially noticed Ms. Watson's sedan because of its "badly cracked" windshield. *Yorks Narrative* at 1.  This prompted Officer Yorks to check the sedan's registration, which he learned was suspended for toll violations. *Id.*  Officer Yorks then decided to initiate a traffic stop because the

sedan was being operated with a suspended registration. *Id.* Correspondence submitted by the Government confirms the sedan's registration was in fact suspended on July 10, 2023, the day of the traffic stop and Mr. Partridge's arrest. *BMV Letters*.

Maine law establishes that driving with a suspended registration is a misdemeanor offense. *See* 29-A M.R.S. § 2417 ("A person commits a Class E offense if that person operates or permits another to operate a vehicle when the registration of that vehicle is suspended or revoked"). Therefore, the driver of the sedan was engaging in "unlawful conduct involving a motor vehicle or its operation." *Jenkins*, 680 F.3d at 104. Because Officer Yorks personally observed the sedan traveling through Augusta with a suspended registration, the initiation of the traffic stop satisfied the Fourth Amendment. *See Carr*, 534 F. Supp. 3d at 147 ("[I]nitiation of a traffic stop will not violate the detained individuals' constitutional rights if the stop is supported by the officer's observation of a traffic violation").

Mr. Partridge suggests there is insufficient evidence that the sedan's suspended registration was the actual reason for the stop. *See Def.'s Reply* at 1-2. Instead, relying on the Duquette Affidavit, he argues that Officer Yorks stopped the sedan because of its "severely cracked windshield." *Def.'s Mot.* at 5-6. But if the Duquette Affidavit does characterize the cracked windshield as a basis for the stop, which is not clear,[9] it nowhere says that the cracked windshield was the *only* reason for the stop. Therefore, even reading the Duquette Affidavit as Mr. Partridge urges,

---

[9]    The Duquette Affidavit reads, in relevant part: "Officer Simon Yorks initiated the traffic stop after noticing that the Subject Vehicle's windshield was badly cracked. Officer Yorks learned from his dispatch, after running the Subject Vehicle's license plate, that its registration had been suspended for toll violations." *Duquette Aff.* ¶ 3.

the Court fails to see how it contradicts Officer Yorks' version of events: that he noticed the sedan because of its cracked windshield, subsequently learned that the registration was suspended, and then initiated the traffic stop.

Further, Mr. Partridge concedes that the factual tension he perceives between Officer Yorks' police report and the Duquette Affidavit "can be resolved by Officer Yorks's testimony under oath at an evidentiary hearing." *Def.'s Reply* at 5-6. At the evidentiary hearing, Officer Yorks testified, consistent with his police report, that the cracked windshield drew his attention to the sedan but he ultimately stopped the car because of the suspended registration. *See Yorks Narrative* at 1 ("Due to this suspended registration I decided to conduct a motor vehicle stop . . .."). During cross-examination, Officer Yorks was pressed to concede that he stopped the Watson vehicle only because of the cracked windshield, but Officer Yorks stood his ground. He testified that while on patrol, he will often run car registrations and that he did so in this case. Once he determined that the registration was suspended, Officer Yorks said that he decided to stop the Watson vehicle. The Court accepts Officer Yorks' testimony and concludes he lawfully stopped the sedan at least in part because of its suspended registration.[10]

---

[10] At the evidentiary hearing, counsel for Mr. Partridge questioned Officer Yorks about whether he would have run the sedan's registration had he not noticed the cracked windshield. Although Officer Yorks declined to admit that he would not have run the registration but for the cracked windshield, Mr. Partridge has not pointed to any caselaw suggesting that Officer Yorks was required to justify checking the registration of a vehicle traveling on a public roadway.

**B.** **Reasonable Suspicion to Expand the Scope of the Traffic Stop**

Mr. Partridge next suggests the traffic stop was prolonged and questions the sufficiency of the Government's evidence that there was reasonable suspicion to expand the scope of the stop. In general, "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (third and fourth alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 354 (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (alteration in original) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). Accordingly, "[a]uthority for the seizure [] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 740 U.S. 675, 686 (1985)).

On a more granular level, after the initiation of a lawful traffic stop, "actions undertaken pursuant to that stop must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *Ruidíaz*, 529 F.3d at 28-29 (quoting *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)). In addition to "determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 575 U.S. at 355

22

(alteration in original) (quoting *Caballes*, 543 U.S. at 408).  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* (citing *Prouse*, 440 U.S. at 658-60).  "In addition, due to the 'inherent dangers of a traffic stop,' the police may request identification from passengers in the vehicle, so long as those requests 'do not measurably extend the duration of the stop.'"  *United States v. Clark*, 879 F.3d 1, 4 (1st Cir. 2018) (quoting *Chaney*, 584 F.3d at 26).

Although a law enforcement officer ordinarily may not prolong a traffic stop beyond the time necessary to investigate the underlying traffic infraction, "[r]easonable suspicion may nonetheless develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose."  *United States v. Ramdihall*, 859 F.3d 80, 90 (1st Cir. 2017).  "In evaluating whether reasonable suspicion exist[s, courts] 'look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'"  *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006) (second alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "In gauging whether the circumstances generate a reasonable suspicion, [courts] apply 'an objective standard, rather than assessing the subjective intent of an individual officer.'"  *United States v. Fagan*, 71 F.4th 12, 18 (1st Cir. 2023) (quoting *United States v. Tiru-Plaza*, 766 F.3d 111, 116 (1st Cir. 2014)).  Further, reasonable suspicion is a "determination that entails a measurable

degree of deference to the perceptions of experienced law enforcement officers." *Ruidíaz*, 529 F.3d at 29 (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996); and *Chhien*, 266 F.3d at 8).

"To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *Chhien*, 266 F.3d at 6. "[W]hile an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." *Id.* This is because "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) (quoting *Terry*, 392 U.S. at 10).

Here, the record demonstrates that Officer Yorks pursued the mission of the traffic stop until there was reasonable suspicion of drug activity. After stopping the sedan and approaching the car on the passenger side, Officer Yorks spoke to Ms. Watson through the open front passenger window and explained the reason for the stop. *Yorks Narrative* at 1; *Yorks Cruiser Video* at 01:30-01:50. Next, he asked Ms. Watson and Mr. Partridge for identification; Ms. Watson provided her driver's license and Mr. Partridge claimed his name was "Aaron Watson." *Yorks Narrative* at 1; *Yorks Cruiser Video* at 02:02-02:11. Officer Yorks also asked Ms. Watson for her

24

insurance information.  *Yorks Narrative* at 1.  All these actions were permissible in the context of a traffic stop.  *See Rodriguez*, 575 U.S. at 355 (noting permissible activities during a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"); *Clark*, 879 F.3d at 4 (noting officers may also "request identification from passengers in the vehicle").

While waiting for Ms. Watson to produce her insurance information, Officer Yorks made several observations that gave rise to a reasonable suspicion of drug activity.  First, he noticed a small tan rubber container, of a type he knew to be commonly used to store illegal drugs, on the sedan's center console.  *Yorks Narrative* at 1; *Gallagher Narrative* at 1.  Next, he observed a "push rod," another indicator of drug activity, situated near Mr. Partridge's legs.  *Yorks Narrative* at 1.  Finally, he identified the sedan's rear passenger, who had been reaching under herself and was wearing only a bathrobe, as Heather Jones, who he was familiar with from prior drug investigations and police contacts.  *Id.*; *Gallagher Narrative* at 1.

It was after making all these observations—suggesting drug-related activity—that Officer Yorks first deviated from the traffic stop's mission by asking Ms. Watson about the contents of the tan rubber container.  This deviation was supported by reasonable suspicion based on plain-view observations of two objects commonly associated with drug activity and a passenger, known from prior drug investigations, who was dressed and acting strangely.  Viewed in totality, the circumstances demonstrate that Officer Yorks "ha[d] a particularized and objective basis for

25

suspecting legal wrongdoing." *See Monteiro*, 447 F.3d at 43 (alteration in original) (quoting *Arvizu*, 534 U.S. at 273). Therefore, he properly "shift[ed] his focus and increase[d] the scope of his investigation." *See Chhien*, 266 F.3d at 6.

Further, Officer Yorks' actions after acquiring reasonable suspicion—asking Ms. Jones to exit the sedan and inquiring into the contents of the tan rubber container—were "fairly responsive to the emerging tableau." *See Chhien*, 266 F.3d at 6. In particular, Officer Yorks' questions about the container were minimally intrusive and aimed at quickly confirming or dispelling his suspicion of drug activity. The Court concludes that Officer Yorks pursued the mission of the traffic stop until there was reasonable suspicion of drug activity, at which point he lawfully shifted his focus to investigating the more serious criminal activity.

## C.    Probable Cause to Search the Sedan

After Officer Yorks began to suspect that drug activity was afoot, he quickly developed probable cause to search the sedan. In general, "[t]he Fourth Amendment guarantees the right to be free from unreasonable searches and seizures in the absence of a warrant supported by probable cause." *United States v. White*, 804 F.3d 132, 136 (1st Cir. 2015) (citing U.S. CONST. amend. IV). However, "[t]he automobile exception to the Fourth Amendment's warrant requirement permits officers to 'seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband.'" *United States v. Cruz-Rivera*, 14 F.4th 32, 43 (1st Cir. 2021) (quoting *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2014)). This exception also allows officers to search containers within

26

vehicles in which the relevant contraband may be found. *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search"); *California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained").

"Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found.'" *Silva*, 742 F.3d at 7 (quoting *Robinson v. Cook*, 706 F.3d 25, 32 (1st Cir. 2013)). Like reasonable suspicion, "[t]he test for probable cause is not reducible to 'precise definition or quantification.'" *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Instead, "[t]he standard is satisfied when the totality of the circumstances create a fair probability that . . . evidence of a crime will be found in a particular place." *Dion*, 859 F.3d at 132 (alterations in original) (quoting *Silva*, 742 F.3d at 7). "[A]ll that is required is the kind of 'fair probability on which reasonable and prudent people, not legal technicians, act.'" *Id.* (quoting *Harris*, 568 U.S. at 244).

Relevant here, after Officer Yorks developed reasonable suspicion of drug activity, he asked Ms. Watson about the contents of the tan rubber container. *Yorks Narrative* at 1. Ms. Watson replied that there were "dabs" in the container. *Id.* Having been told the container held drugs, Officer Yorks asked to see its contents for

27

himself. *Id.* When Ms. Watson opened the container and held it out for Officer Yorks to examine, Officer Yorks observed a tan powder residue consistent with heroin or fentanyl. *Id.* Officer Yorks relayed his observations to Ms. Watson, who insisted the container held some form of THC at one time. *Id.* At this point, Officer Yorks informed Ms. Watson he had developed probable cause that drug crimes were occurring in the sedan and he would be searching it. *Yorks Narrative* at 1; *Gallagher Narrative* at 1.

By the time Officer Yorks began searching the sedan, he was aware of the following facts: 1) there was a tan rubber container, of the type commonly used to store illegal drugs,[11] in the sedan; 2) this container held residue consistent with heroin or fentanyl, not "dabs" as Ms. Watson claimed; 3) there was a push rod, also commonly associated with drug activity, in the sedan; 4) the sedan's rear passenger, Ms. Jones, had been involved in prior drug investigations; and 5) Ms. Jones was wearing only a bathrobe and reaching around under herself.

Viewed in totality, these circumstances give rise to "a fair probability" that further evidence of drug activity would be found in the sedan. *See Dion*, 859 F.3d at 132 (quoting *Silva*, 742 F.3d at 7). The information relied upon by Officer Yorks was "reasonably trustworthy"—based on his personal observations—and the Court determines that it was "sufficient to warrant a person of reasonable caution in the belief that evidence" of drug activity would be found in the sedan. *See Silva*, 742 F.3d at 7. Officer Yorks observed not only drug paraphernalia, but also residue consistent

---

[11] At the evidentiary hearing, Officer Gallagher echoed Officer Yorks' conclusion that this type of tan rubber container is commonly used to store illegal drugs.

with heroin or fentanyl.  Based on the drug paraphernalia, individual associated with prior drug investigations, and, most importantly, drug residue in the sedan, the Court concludes Officer Yorks had probable cause to search, and the search was proper. Accordingly, the Court concludes that no Fourth Amendment violations took place during the July 10, 2023 traffic stop.[12]

### D.    Evidentiary Irregularities

Notwithstanding the above analysis, Mr. Partridge's central argument is not that the Government's facts, if true, fail to show Officer Yorks' actions during the July 10, 2023 traffic stop comported with the Fourth Amendment.  Rather, Mr. Partridge questions whether the Government has satisfied its burden of establishing its proposed facts by a preponderance of the evidence.  *See Def.'s Mot.* at 5-6 ("There is nothing in the record to tell us the nature of that cracked windshield"); *id.* at 7 ("[T]here is nothing in the record to substantiate the presence or character of the 'small tan rubber container' or the 'push rod' upon which [the Government] relies to suggest those items provided reasonable suspicion of drug activity"); *Def.'s Reply* at 1-2 ("The Government has failed to cure the lack of support for the bases upon which law enforcement relied for its unlawful stop and search" (capitalization altered)). Indeed, at the evidentiary hearing, Mr. Partridge's counsel candidly acknowledged that the key issue before the Court is whether Officer Yorks' testimony is sufficient to establish the facts outlined above.

---

[12]    Due to this conclusion, the Court does not reach the Government's arguments that the attenuation and inevitable discovery doctrines apply.  *See Gov't's Opp'n* at 9-13.

29

The Court agrees with Mr. Partridge that there are several irregularities. First, although the dashcam on Officer Yorks' police cruiser recorded the July 10, 2023 traffic stop, Officer Yorks' body-worn microphone apparently malfunctioned, resulting in the dashcam video having no audio.  Additionally, Officer Gallagher did not activate his cruiser's dashcam upon arriving at the scene, nor did he ever manually activate his body-worn microphone.  Officer Gallagher testified that this oversight violated an APD directive that officers must activate their body-worn microphones during all felony stops.[13]  Therefore, as a result of technical difficulties and failure to follow departmental policy, there are apparently no audio recordings of the July 10, 2023 traffic stop.

Additionally, none of the officers on scene photographed or seized as evidence either the small tan rubber container or the push rod, both of which contributed to the reasonable suspicion to prolong the stop and the probable cause to search the sedan.  The failure to separately photograph the container, however, is substantially mitigated because it is visible on the top of Ms. Watson's motor vehicle in the dashcam footage.  *Yorks Cruiser Video* at 06:30-07:14, 07:50-08:01; *Screenshot*.  At the same time, there is no evidence of the push rod apart from Officer Yorks' testimony.[14] While Officer Yorks conceded that it was typical for APD officers to photograph items

---

[13]     At the evidentiary hearing, Officer Gallagher explained that he did not believe the stop was a felony stop when he arrived on scene, and accordingly, he did not think to activate his body-worn microphone.  Although Officer Gallagher conceded that the July 10, 2023 traffic stop eventually developed into a felony stop, he further testified that he forgot to turn on his microphone when the traffic stop became a felony stop.

[14]     At the evidentiary hearing, Officer Gallagher testified that he knew from being at the scene and subsequently reading Officer Yorks' police report that Officer Yorks observed a push rod; however, Officer Gallagher clarified that he never saw the push rod himself.

supporting probable cause determinations, neither Officer Yorks nor Officer Gallagher remembered APD's policy regarding photography of items underlying probable cause. Because of the officers' failure to follow typical procedure, the record contains no photographs or videos of the push rod.

Finally, it is curious that Ms. Watson was allowed to drive away in the sedan, despite it having a "badly cracked" windshield and a suspended registration. *Yorks Narrative* at 1; *Gallagher Narrative* at 1; *BMV Letters*. If the crack in the sedan's windshield was significant enough to draw Officer Yorks' attention and lead in part to the traffic stop, the Court is concerned about why Ms. Watson was allowed to drive away without any officer taking steps to ensure the windshield would be fixed.

However, as the Government argued, it seems apparent in viewing the dashcam video, reviewing the police reports, and assessing the officers' testimony that the focus of the traffic stop changed after the police learned of Mr. Partridge's true identity, his active arrest warrant, the significant quantity of heroin or fentanyl in his backpack, and his firearm. Instead of a cracked windshield and a suspended registration, the officers turned their full attention to the arrest of a potential drug trafficker in a highly addictive narcotic.

Thus, the Court concludes the preponderance of the evidence establishes that the events of the July 10, 2023 traffic stop unfolded as described above. To start, the Court heard testimony under oath from both Officer Yorks and Officer Gallagher at the April 17, 2024 suppression hearing. The Court expressly finds that both officers were highly credible. Their testimony was consistent and mirrored their police

31

reports.  Further, the Court confirmed critical elements of the officers' testimony by reviewing Officer Yorks' dashcam video.  Most significantly, the dashcam video shows Officer Yorks taking the tan rubber container from Ms. Watson and setting it on the roof of the sedan.  *Yorks Cruiser Video* at 06:30-07:14.  A few moments later, Officer Yorks briefly picks up the container again.  *Id.* at 07:50-08:01.  Therefore, the dashcam video confirms that Officer Yorks and Officer Gallagher did not fabricate the existence of the container, which in turn bolsters their credibility with respect to other elements of their testimony, such as the existence of the push rod, that cannot be confirmed by viewing the dashcam video.

Mr. Partridge has not proffered any evidence that either Officer Yorks or Officer Gallagher is not credible, nor has he pointed to any aspect of their testimony that undermines the Court's credibility finding.  Instead, he argues the Court would be starting down a slippery slope by accepting Officer Yorks' testimony on uncorroborated facts.  But he cites no authority that courts should necessarily disregard law enforcement testimony where the evidence described could have been, but was not, memorialized in some way.  Nor could the Court find support for such a rule in its own research.  Although a court could find that the failure to document important evidence undercuts an officer's credibility, the Court in this case, having had the opportunity to observe the officers and assess their testimony, has found them both highly credible despite their failure to document all the potential evidence.

In general, technological failures have not precluded courts from crediting law enforcement's version of events in ruling on motions to suppress.  *See United States*

32

*v. Pérez-Vásquez*, 6 F.4th 180, 194-95, 195 n.5 (1st Cir. 2021) (upholding the denial of a defendant's motion to suppress statements to law enforcement even though audio recording equipment malfunctioned during the defendant's interrogation). Likewise, courts have not found that a failure to photograph evidence requires suppression. *See United States v. Delaney*, 651 F.3d 15, 17-19 (D.C. Cir. 2011) (upholding the denial of a motion to suppress where "the district court credited the officers' testimony notwithstanding . . . apparent protocol violations," including failing to photograph evidence in accordance with departmental policy); *United States v. Johnson*, 601 F.3d 869, 871-72 (8th Cir. 2010) (upholding the denial of a motion to suppress despite an officer's failure to photograph and seize a "crack wrapper"); *see also Covington v. United States*, No. 3:15-cv-301-RJC, 2015 U.S. Dist. LEXIS 146763, at *7 (W.D.N.C. Oct. 29, 2015) ("The failure to photograph evidence does not establish a basis for suppressing such evidence").

Ultimately, while audio of the July 10, 2023 traffic stop and photographs of the container and push rod may have aided the Court's adjudication of Mr. Partridge's motion, there is other evidence that supports the Court's finding that Officer Yorks and Officer Gallagher are credible. Having determined based on the officers' testimony and police reports that the events of the July 10, 2023 traffic stop did not offend the Fourth Amendment, the Court denies Mr. Partridge's motion to suppress.

V.      **CONCLUSION**

The Court DENIES Ryan Partridge's Motion to Suppress (ECF No. 27).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of April, 2024